

**David Stoelting**
**Senior Trial Counsel (DS-0565)**

**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center**
**New York, New York 10281**
**(212) 336-0174**



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **08 Civ. ___ (__)** |
| | : | |
| -against- | : | |
| | : | |
| **JAMES J. TREACY and ANTHONY BONICA,** | : | **COMPLAINT** |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

Plaintiff Securities and Exchange Commission ("Commission") alleges the following

against Defendants James J. Treacy ("Treacy") and Anthony Bonica ("Bonica") (collectively, the

"Defendants"):

## SUMMARY

1.     Treacy, the former President and COO of Monster Worldwide, Inc. ("Monster" or

the "Company"), and Bonica, the former Controller, participated in a fraudulent stock option

backdating scheme.  As a result, the Defendants' fraudulent conduct caused Monster's periodic

filings and proxy statements to falsely portray Monster's options as having been granted at

exercise prices equal to the fair market value of Monster's common stock on the date of the grant, when, in fact, Monster was granting in-the-money options.

2.      More specifically, when making "Broad-Based Grants" of options to numerous recipients, Treacy, among others at Monster, would select a low closing stock price at which the Company wanted to grant stock options. Employees then prepared backdated documentation for Monster's Compensation Committee containing the grant date that coincided with the low closing price for Monster's common stock. This documentation made it appear that the Compensation Committee authorized the grant of options on the purported grant date. In fact, the Compensation Committee did not take any such action. Rather, the Compensation Committee did not approve the grant of options until long after the purported grant date. With respect to "One-Off Grants," option grants to new employees or to current employees in connection with special achievements, Treacy, among others at Monster, selected low stock closing prices at which to grant these options. Bonica also participated in the backdating of certain One-Off Grants.

3.      Treacy and Bonica understood the accounting consequences of granting in-the-money options. Despite this understanding, Treacy and Bonica did nothing to ensure that the Company properly described its options practices in Monster's public filings or properly accounted for these options in Monster's financial statements.

4.      The Defendants' fraudulent conduct caused Monster to file materially false and misleading public reports that contained financial statements that materially understated the Company's compensation expenses and materially overstated its quarterly and annual net income. On December 13, 2006, Monster restated its historical financial results for 1997-2005

2

in a cumulative pre-tax amount of approximately $339.5 million to record additional non-cash charges for option related compensation expense.

5.    Treacy and Bonica each benefited from the fraudulent scheme, including the receipt and exercise of backdated grants of in-the-money options.

## JURISDICTION AND VENUE

6.    The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7.    The Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices and courses of business alleged herein.

8.    Venue is proper because Monster maintained an office in New York, New York at all relevant times, and certain of the acts, transactions, practices and courses of business alleged herein took place in the Southern District of New York.

## STATUTES AND RULES VIOLATED

9.    Treacy has engaged, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)], and Rules 10b-5, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3] thereunder.

10. Treacy has also engaged, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that aided and abetted Monster's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)], and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

11. Bonica has engaged, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5) and 78n(a)], and Rules 10b-5, 13b2-1 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.14a-9] thereunder.

12. Bonica has also engaged, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that aided and abetted Monster's violations of Sections 10(b), 13(a), 13(b)(2)(A) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)], and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.14a-9] thereunder.

13. Defendants should be permanently enjoined from violating the provisions of the securities laws described above. Defendants should also be ordered to disgorge any ill-gotten gains or benefits derived as a result of their violations (whether realized, unrealized or received) and prejudgment interest thereon, and ordered to pay appropriate civil money penalties. In addition, Treacy should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that

is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].
The Court should also order any other just and appropriate relief.

## THE DEFENDANTS

14.     **James J. Treacy**, 50, a resident of Glen Rock, New Jersey, joined Monster in
1994 as the CEO of the recruitment advertising division.  In 1998, Treacy became an executive
vice president, chief operating officer and a member of the board of directors.  In November
2001, Treacy became Monster's president and chief operating officer.  On August 7, 2002,
Treacy announced his resignation from Monster effective as of December 31, 2002.  He
remained on the board of directors through 2003.  Treacy holds a BBA in accounting.

15.     **Anthony Bonica**, 58, a resident of Massapequa Park, New York, joined Monster
in April 1995, and was the controller until mid-2001, when he then became the vice president
investor relations and financial planning.  Monster suspended Bonica on November 21, 2006, in
connection with its internal investigation into Monster's stock option grant practices.  Bonica's
employment was terminated on December 15, 2006.  Bonica is a certified public accountant.

## THE COMPANY

16.     **Monster Worldwide, Inc.**, formerly known as TMP Worldwide Inc., is a
Delaware corporation that is the parent company of Monster.com, a leading global online career
and recruitment resource.  The Company, headquartered in New York, New York, employs
approximately 4,600 employees in 35 countries.  Monster's common stock is currently registered
with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ
National Market System under the symbol "MNST."   The Company's initial public offering of
shares of its common stock occurred on December 12, 1996.

## FACTS

17.    Monster backdated the vast majority of stock options that it granted to its employees. Monster's public filings did not accurately describe the Company's stock option practices. Additionally, most of Monster's option grants were in-the-money on the day they were granted and therefore had an immediate compensatory component that Monster failed to expense properly and otherwise failed to disclose to shareholders. Monster's backdating scheme continued until approximately April 2003.

18.    Throughout the relevant period, Treacy and Bonica understood that backdating stock option grants was improper. Defendants also understood that because Monster was issuing in-the-money options, the Company was required to recognize, but did not recognize, a compensation expense for these options.

### *Accounting For Options Under*
### *Generally Accepted Accounting Principles ("GAAP")*

19.    From 1996 through 2005, Monster accounted for stock options using the intrinsic method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." The measurement date, as defined by APB 25, is the first date on which the following information is known: (i) the number of options that an individual employee is entitled to receive and (ii) the exercise price. An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed.

6

### *The Option Granting Process At Monster*

20.    Monster's option grants fell into two main categories: (a) options granted to a large number of recipients, including rank and file employees ("Broad-Based Grants"); and (b) options granted to newly-hired employees, new employees from Monster's acquisition of other companies, or current employees in connection with promotion, retention or meeting productivity goals ("One-Off Grants").

21.    During the relevant period, the Compensation Committee approved the vast majority of stock option grants through the use of a unanimous written consent ("UWC").

22.    The UWCs describe the grants including the exercise price, contain an "as of" date, purportedly indicating the date on which the Compensation Committee approved the stock option grants, and typically refer to an attached Schedule A. The Schedule A was intended to be a separate document listing the names of the grantees and the number of shares subject to each option.

23.    For much of the relevant period, Monster's Human Resources Department ("HR") tracked its option grants through an electronic database known as "Transcentive." To enter a stock option grant into Transcentive, HR was required to input the optionee's name, social security or other identification number, the number of shares, exercise price and vesting schedule of the relevant option. Without all of this information, Transcentive would not accept the entry. Once HR input an option grant entry into Transcentive, key fields such as Grant Date, Option Price and Total Shares per Grant for a particular grant could not be modified without complete deletion of the entry and the inputting of a new entry with the amended data.

24.     HR would typically enter information about particular Broad-Based Grants and One-Off Grants into the Transcentive system after it had all of the necessary information for the grants.

25.     As will be described below, based on their involvement in the option grant process, Treacy and Bonica knew, or were reckless in not knowing, that the UWCs were false because the "as of" dates did not represent the true option grant dates. Defendants knew, or were reckless in not knowing, that the Compensation Committee had not authorized the option grants on the "as of" dates. In fact, Monster frequently did not even determine who would receive options and what their allocations would be until long after the UWCs' "as of" dates, and accordingly, there was no way the Compensation Committee could have authorized the grants until a much later date.

### *Monster's Backdated Broad-Based Grants*

26.     With regard to Broad-Based Grants, before any approval by the Compensation Committee, Treacy or Andrew McKelvey, the former chief executive officer of Monster ("McKelvey"), determined the number of options available for grants to the corporate division, which included senior management, as well as the number of options to be allocated to each of the other divisions at Monster.

27.     Treacy or McKelvey communicated the grant date or exercise price to HR based upon a recent low closing price for Monster's stock.

28.     For most Broad-Based Grants, HR then circulated memoranda to each of Monster's various divisions that contained the exercise price, and set a deadline for the divisions to allocate the options amongst their employees and provide their options allocations to HR.

29.    Once HR received the allocations from the divisions, Monster's general counsel, Myron Olesnyckyj ("Olesnyckyj"), or HR would complete the documentation for the grants, which often had a purported grant date from months earlier.

30.    For example, the Compensation Committee purportedly approved a Broad-Based Grant pursuant to a UWC dated "as of" December 1, 1999 at the closing price of $95. This grant date is notable because the next day, December 2, 1999, was the second largest percentage increase in Monster's stock price in the history of the Company due to the announcement of a transaction between Monster and America Online.

31.    On January 19, 2000, HR distributed a memorandum to Monster's division heads, announcing that the strike price was $95, and asking for their options allocations by February 18, 2000. Treacy was copied on this memorandum.

32.    Monster did not complete the list of individuals who would receive options, and what their allocations would be, until after February 18, 2000. Accordingly, the Compensation Committee could not have approved these option grants until after February 18, 2000.

33.    The December 1, 1999 closing price of $95 was the lowest strike price from December 1, 1999 through February 29, 2000.

34.    Further, from approximately October 31, 1999 to February 18, 2000, the full Board of Directors acted as the Compensation Committee. Thus, as a member of the Board, Treacy acted as a member of the Compensation Committee during this time period.

35.    Treacy signed multiple UWCs from October 31, 1999 to February 18, 2000, including UWCs for the Broad-Based Grant purportedly approved on December 1, 1999, as well as One-Off Grants purportedly approved on November 10, 1999, January 5, 2000, January 14, 2000 and January 24, 2000. As discussed above, the December 1, 1999 UWC was backdated

9

because a list of the grantees and their option allocations for this Broad-Based Grant could not have been completed until after February 18, 2000. Accordingly, Treacy knew that he did not adequately approve the Broad-Based Grant "as of" December 1, 1999.

36.    In addition, the Compensation Committee purportedly approved a Broad-Based Grant pursuant to a UWC dated "as of" April 4, 2001 at the closing price of $30.625.

37.    With regard to this Broad-Based Grant, as Monster's stock price began to decline, Monster management changed the date for this grant a number of times. Monster management initially selected January 2, 2001 as the purported grant date for this grant because the stock's closing price, $40.875, was the lowest for Monster stock from December 1, 2000 through early March 2001. In early March, however, Monster's stock price began to drop. In an email dated March 13, 2001, Olesnyckyj asked Bonica, copying Treacy and others, whether any information had been provided to Monster's auditors, BDO Seidman, LLP ("BDO"), that would preclude Monster from ignoring the January option grants.

38.    On March 20, 2001, Olesnyckyj emailed Bonica and Treacy, amongst others, stating that McKelvey asked what the exercise price is on the recent grant, and "in accordance with our prior discussions," Olesnyckyj advised that the new grant date was March 13, 2001, finishing off by stating "tony I presume you were able to finesse any bdo issues over this." Bonica responded that "[t]here is a lot of joy in a $2.00 per share profit (40-38)...," referencing the fact that the stock price was $40.878 on January 2, 2001, the original grant date, but had fallen to $38.06 on March 13, 2001.

39.    Treacy also responded to Olesncykyj's March 20 email, and did not make any objection to the selecting a new grant date and finessing any BDO issues.

40.    Ultimately, Monster management changed the purported grant date again, to April 4, 2001, in order to obtain an even lower grant price for the options.

41.    Monster's Compensation Committee did not authorize the Broad-Based Grant on April 4, 2001. Monster's Compensation Committee, however, could not have approved the Broad-Based Grant until sometime after that date as Monster was collecting allocations in May 2001.

42.    The closing price of $30.625 on April 4, 2001 was the lowest strike price from December 2000 through September 25, 2001.

43.    In addition, on July 1, 2002, Bonica drafted an email to the CFO concerning a possible Broad-Based Grant for 2002 stating that options "can be granted as a date late in June or early July & still be at a relatively low price." Ultimately, May 6, 2002 was chosen as the date of the Broad-Based Grant even though the options were not allocated to individuals until much later.

44.    In its public filings, Monster did not disclose that it was granting in-the-money options through the Broad-Based Grant process. Monster also did not record a compensation expense for the in-the-money options it was granting through the Broad-Based Grant process.

### *Monster's Backdated and Unauthorized One-Off Grants*

45.    In the late 1990s, McKelvey or HR would notify Olesnyckyj of the terms of One-Off Grants, including the purported grant date and/or exercise price of the grant. Olesnyckyj would then obtain the list of option grantee(s) from McKelvey or another senior officer, or HR. After that, Olesnyckyj would send the UWCs and (sometimes) Schedule As to the Compensation Committee.

11

46.    In late 1999, primary responsibility for options paperwork was transferred from Olesnyckyj to HR. In early 2000, HR created forms to be used for approval of One-Off Grants. In order to have a One-Off Grant approved, an officer or an employee would fill out an approval form with the name of the proposed grantee(s), the specific number of options proposed for each grantee, and a proposed grant date and exercise price. The relevant division head would then sign the approval form and forward the form to McKelvey, or beginning in November 2001, Treacy, for signature. Once McKelvey or Treacy signed the form, it was forwarded to HR for processing. Nothing was sent to the Compensation Committee for approval until after McKelvey or Treacy signed the form.

47.    Even though Treacy did not begin signing these approval forms until approximately November 2001, he was involved with One-Off Grant approvals prior to that time. According to a February 4, 2000 memorandum from HR to Monster's division heads distributing the stock option approval forms, Treacy was to receive copies of all stock option approval forms with McKelvey's approval.

48.    With respect to the vast majority of One-Off Grants, the purported grant dates precede the date on which the Compensation Committee approved the grants by days, weeks and even months.

49.    Monster did not disclose that it was granting in-the-money options through the One-Off Grant process. Monster also generally did not record a compensation expense for the in-the-money options it was granting through the One-Off Grant process.

50.    There were many One-Off Grants from 1997 through April 2003. The vast majority of these grants were backdated, and the Compensation Committee did not approve the

option grants on the purported grant date. Treacy and Bonica participated in the backdating of One-Off Grants.

51.    For example, on December 6, 2001, Treacy approved a grant of options to a Monster employee "as of" November 1, 2001.

52.    In a meeting on December 19, 2001, Treacy agreed that one of Monster's divisions had until mid-January 2002 to allocate options to the division's 30 employees for options to be granted "as of" November 1, 2001. A subsequent email on December 20, 2001 on which Treacy was copied, confirms that HR held 175,000 options from the purported November 1 grant for this allocation.

53.    In this same email exchange on December 20, 2001, HR then stated: "If we move forward with a broad based employee grant, we need to include that number (if it's 11/1/01) with our year end figure to close out the year." Treacy responded to this email later that same day, stating: "We'll look at this together globally, shortly." Treacy did not object to the suggestion, on December 20, that November 1 could be the date of a Broad-Based Grant.

54.    Bonica also was involved in the backdating of options. As a division head, Bonica signed some of the option approval forms for One-Off Grants. For example, Bonica signed the approval forms for two new hires for the finance department, on January 25, 2001 and February 5, 2001 respectively, both of which stated that the option grant date would be "as of" January 2, 2001. Both of these new employees received options "as of" January 2, 2001, which was the lowest Monster stock closing price within 30 days of their start date.

55.    A new employee joined Monster in January 2001. Shortly thereafter, the new employee asked Bonica when he would receive his new hire grant options. Bonica responded that he would receive the options at the best or lowest price within 30 days.

56.     On May 2, 2001, Bonica drafted a note to the CFO stating that the approvals for options for two new hires had fallen through the cracks and presented him with option approval forms that listed grant dates of April 4, 2001. One of these new hires was the new employee that started in January 2001. The CFO signed the approval form on May 2, 2001. After the CFO signed the form, Bonica drafted an additional note for these grants stating that "[CFO] has signed – need AJM's signature." These new hires then received options "as of" April 4, 2001, which was the lowest strike price from December 2000 through September 25, 2001.

57.     From 2000 through 2002, there were also a number of proposals by Monster's Executive Search division to use in-the-money options instead of cash to compensate employees within that division. Treacy and Bonica were aware of these proposals.

58.     In an effort to cut costs, on October 19, 2001, the Executive Search division proposed that Monster use in-the-money options instead of cash for bonuses due to eight employees in that division for the fourth quarter of 2001. The October 19 email suggested a strike price at the lowest price of the quarter to date. Treacy and Olesnyckyj, amongst others, then discussed this proposal until at least November 2, 2001, and agreed to grant in-the-money options instead of cash bonuses. On November 5, 2001, Treacy emailed Olesnyckyj, copying Bonica among others, to say "Okay by me." Later that same day, Treacy emailed Olesnyckyj asking him to "let me know when done."

59.     Following the emails with Treacy and Bonica, Monster granted at least seven of the eight executive search employees these options as if granted on October 2, 2001 with an exercise price of $27.24, the lowest stock price for the quarter. The Compensation Committee could not have approved the grant until after Treacy approved the proposal in November 2001

14

***Defendants Knew, or Were Reckless in not Knowing, that Backdating was Improper***

60.    Treacy and Bonica knew, or were reckless in not knowing, that backdating options to coincide with low closing prices for Monster stock required the company to recognize a compensation expense.

61.    Treacy signed and reviewed Monster's Forms 10-K, and Bonica prepared and reviewed the Forms 10-K, that explicitly discussed APB 25 and stated that Monster complied with its provisions.

62.    In addition, Olesnyckyj discussed the accounting consequences of backdating with Treacy and Bonica.

63.    For example, beginning at least as early as 1999, Olesnyckyj had conversations with Treacy about backdating. In fact, Olesnyckyj had discussions with Treacy about the need to stop backdating. This included a proposal to move from option approvals with UWCs to option approvals at quarterly or monthly Compensation Committee meetings. Olesnyckyj and Treacy, among others, presented this idea to McKelvey and the Compensation Committee in April 2000, but backdating nonetheless continued until April 2003.

64.    Olesnyckyj had conversations with Bonica about backdating. For instance, Bonica told Olesnyckyj that on some occasions McKelvey asked Bonica to bring him lists of the closing prices for Monster stock in order to allow McKelvey to chose a grant date with a low closing price for stock option grants.

65.    In addition, on February 9, 2000, the CFO sent an email to Olesnyckyj, copying Treacy and Bonica, amongst others, in which he stated that with regard to "Below Market Option Pricing" the rule is that "Options issued at below market price must be measured and recorded as compensation expense using either the 'intrinsic value method' (for employees), or the 'fair

15

value method' (for non-employees), respectively. The compensation expense is recognized over the vesting or service period."

66.     In addition, Bonica expressed his understanding of the accounting rules in a number of email exchanges. For example, in an email exchange on June 16 and 17, 1999 concerning options being issued to a particular division's employees, the division head asked for the options to be issued at the lowest price in May. Bonica pointed out that the grant price should be $43.00 with a grant date of May 25, 1999, the lowest price in May. Bonica also stated that if the price for any of the grants is lower than $43.00, he needed to know because there will be an earnings charge.

67.     In a July 2, 1999 email to Olesnyckyj and a division head at Monster, in discussing options, Bonica pointed out that "[a] lower value would result in an _earnings_ hit for the spread between market and grant price on the grant date." (emphasis in original).

### *Defendants Benefited From the Scheme*

68.     Among other forms of compensation, Treacy received backdated option grants on at least six separate occasions, including options granted "as of" January 6, 1997, December 12, 1997, December 9, 1998, August 5, 1999, April 4, 2001 and November 1, 2001.

69.     Treacy exercised and sold backdated options in 2005 and 2006 from the January 6, 1997, December 12, 1997, December 9, 1998, August 5, 1999, and April 4, 2001 grants, among others.

70.     Further, in connection with Treacy's receipt of backdated option grants, he filed Forms 4 and 5 that contained false or misleading statements with regard to those options' expiration dates and exercise prices.

71.    Bonica received backdated option grants on at least six separate occasions, including options granted "as of" January 6, 1997, December 12, 1997, December 9, 1998, December 1, 1999, April 4, 2001 and November 1, 2001.

72.    Bonica has exercised and sold backdated options from the January 6, 1997 and December 12, 1997 grants, among other.

### Monster's Materially False and Misleading Forms 10-K, 10-Q and 8-K

73.    Each of Monster's Forms 10-K for fiscal years 1997 through 2005, and each of Monster's Forms 10-Q during the same period, materially understated Monster's compensation expenses and materially overstated the Company's net income because Monster failed to expense the in-the-money portion of its stock option grants during that period as APB 25 required.

74.    From 1997 through 2001, Monster's Forms 10-K falsely stated that it "accounts for its stock option awards under the intrinsic value based method of accounting prescribed by Accounting Principles Board Opinion No. 25, 'Accounting for Stock Issued to Employees.' Under the intrinsic value based method, compensation cost is the excess, if any, of the quoted market price of the stock at grant date or other measurement date over the amount an employee must pay to acquire the stock."

75.    In addition, in its Forms 10-K for the years 1997 through 2000, Monster falsely stated that "Under APB 25, because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."

76.    From 2002 through 2005, Monster's Forms 10-K falsely stated that "The Company's financial statements are presented in accordance with the Accounting Principles Board's Opinion No. 25, Accounting for Stock Issued to Employees. Under APB No. 25,

generally, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock as defined. As the Company only issues fixed term stock option grants at or above the quoted market price on the date of the grant, there is no compensation expense recognized in the accompanying combined financial statements."

77.    Further, in 1997 and 1998, Monster's Forms 10-K outlined the grant details, including the purported date, for each of the option grants those years. That information was false.

78.    Monster did not present its financial statements from 1997 through 2005 in accordance with APB 25 because Monster did not record compensation expense for the in-the-money options it granted. In fact, Monster's restatement of its financial statements disclosed that Monster's compensation expense was understated by approximately $339.5 million pre-tax, $272 million after tax, during the period 1997 through 2005.

79.    Because Monster did not record the appropriate compensation expense for the in the money options, Monster's aggregate net income, as reported in its Forms 10-K, was overstated. For example, Monster's Form 10-K for 2001 reported that Monster's net income was $69,020,000. After Monster took the appropriate compensation expense, however, the Company's net income dropped to $3,439,000, as reported in the restatement. Consequently, Monster's net income for 2001 was overstated by over 1900%.

80.    From 1997 through 2005, Monster's Forms 10-Q were also misleading because, among other things, the financial statements did not reflect the correct compensation expense for the in-the-money options Monster granted.

18

81.    In addition, beginning in the Form 10-Q for the second quarter of 2003, each Form 10-Q included the following disclosure: "The Company accounts for employee stock-based compensation in accordance with APB No. 25. Under APB No. 25, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock. As the Company only issues fixed term stock option grants at or above the quoted market price on the date of the grant, there is no compensation expense recognized in the accompanying financial statements."

82.    From 1997 through 2005, some of Monster's Forms 8-K were misleading.  At least six of Monster's reports filed on Forms 8-K contained disclosure language concerning APB 25.  Monster's Forms 8-K filed on March 17, 1999, April 21, 1999, June 10, 1999, September 30, 1999, December 2, 1999 and July 21, 2000 contained the following disclosure: "The Company applies Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25) and related Interpretations in accounting for its employee stock options. Under APB 25, because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."

83.    In addition, Monster's Forms 8-K that contained financial statements from 1997 through 2005 were misleading because the financial statements, among other things, did not reflect the correct compensation expense for in the money options.

84.    Treacy reviewed and signed Monster's Forms 10-K for the years 1998 through 2001.  In addition, Treacy reviewed Monster's Form 10-K for the year 2002.

85.    Bonica prepared and reviewed various Forms 10-K, 10-Q and 8-K filed by Monster for the years 1997 through 2005. For many of these filings, Bonica was the primary draftsperson.

86.    Defendants knew, or were reckless in not knowing, that these public filings were materially false and misleading.

### Monster's Materially False and Misleading Proxy Statements

87.    Monster sent shareholders proxy statements in connection with its annual shareholder meetings during the period 1997 through 2003.

88.    Monster's proxy statements were signed by order of the Board of Directors and Treacy was a director during this time period.

89.    Bonica prepared and/or reviewed portions of the proxy statements for the years 1997 through 2003.

90.    The Monster proxy statements that were sent to shareholders in connection with the annual shareholders' meeting included discussions about: (i) the election of directors, and (ii) the approval and adoption of Monster's stock option plans and amendments thereto.

91.    The proxy statements filed from 1997 through 2003 falsely represented in the "Executive Compensation" section that options had been granted to Monster's top executives in previous years on particular dates when those dates were not, in fact, the dates that the Compensation Committee approved the grant. These proxy statements also failed to disclose that the option grants were in-the-money at the time of the grants.

92.    In the proxy statements, shareholders were asked to approve amendments to Monster's stock option plans which gave the Compensation Committee sole and absolute discretion to determine the identity of option grantees and the size and terms of option grants. In

asking shareholders to approve plans with those provisions, the proxy statements failed to inform shareholders that Defendants and others routinely backdated grants and processed other grants without ever seeking Compensation Committee approval.

93.     Further, Monster's proxy statement filed May 14, 1999 stated that the Compensation Committee adopted a stock option plan on December 9, 1998 that authorized 15 million shares. The Compensation Committee, however, did not take any such action on December 9, 1998.

94.     Monster's proxy statements were incorporated in Monster's Forms 10-K.

95.     Defendants knew, or were reckless in not knowing, that there were materially false and misleading statements in these proxy statements.

### *Monster's Materially False and Misleading Registration Statements*

96.     Between December 1996 and April 2003, a number of Monster's registration statements became effective including a Form S-1 effective in September 1997, a Form S-4 effective in July 1999 and various Forms S-8.

97.     These registration statements incorporated by reference materially false and misleading financial statements, as well as materially false and misleading disclosures, from Monster's Forms 10-K, 10-Q and 8-K, and proxy statements.

98.     Treacy reviewed and signed a Form S-4 effective in July 1999.

99.     Although his role in preparing and reviewing the filings varied, Bonica prepared and/or reviewed various registration statements between December 1996 and April 2003.

100.     Defendants knew, or were reckless in not knowing, that there were materially false and misleading statements in these registration statements.

### *Materially False and Misleading Statements to Monster's Auditors*

101.    Treacy and Bonica misled Monster's outside auditors in an attempt to hide the backdating scheme.

102.    In addition to the events discussed above, Treacy reviewed and signed the management representation letters in connection with the annual audits and quarterly reviews of Monster from 2001 through 2002. Bonica reviewed and signed at least one management representation letter dated May 14, 2001. Treacy and Bonica knew, or were reckless in not knowing, that these letters contained false and misleading statements.

103.    For example, in the management representation letters, Treacy and Bonica falsely represented that the financial statements were presented in conformity with GAAP, despite their knowledge that Monster did not record the correct compensation expense for the in-the-money options the Company granted.

104.    Treacy and Bonica also falsely represented in the management representation letters that there had been no fraud involving management or employees who have significant roles in internal controls.

105.    In addition, the management representation letters state that an attached schedule "constitutes a complete and accurate listing of all unanimous consents and resolutions of the board of directors and its committees" during the time period covered by the letter. The attached schedule, however, was not accurate.

### *Monster's Books and Records*

106.    By virtue of Defendants' misconduct, Monster's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the Company's stock-based compensation expenses, and the Company's financial condition.

107.    Treacy signed UWCs that contained false option grant dates. He regularly approved grants of options or directed that grants be made after the purported "as of" grant date.

108.    Bonica knew that the grant information being entered into Transcentive did not reflect the actual grant dates for stock options, yet allowed Monster's finance department to rely upon this information for its options-related disclosures.

109.    Bonica also allowed false information about stock options to be provided to Monster's outside auditors, including the Transcentive printouts and the UWCs.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violations of Section 17(a) of the Securities Act as to Defendants Treacy and Bonica)**

110.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 109 above.

111.    Defendants Treacy and Bonica, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of Monster securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of Monster securities.

112.    By engaging in the conduct alleged above, defendants Treacy and Bonica violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

23

## SECOND CLAIM FOR RELIEF
### (Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder as to Defendants Treacy and Bonica)

113. The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 112 above.

114. Defendants Treacy and Bonica, directly or indirectly, by use of the means or

instruments of interstate commerce, or of the mails, or of a facility of a national securities

exchange, knowingly or recklessly:  (a) employed devices, schemes, or artifices to defraud; (b)

made untrue statements of a material fact or omitted to state a material fact, necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated

or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of

securities.

115. By engaging in the conduct alleged above, defendants Treacy and Bonica violated

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

thereunder.

## THIRD CLAIM FOR RELIEF
### (Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder as to
### Defendants Treacy and Bonica)

116. The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 115 above.

117. Defendants Treacy and Bonica by the use of the mails or by any means or

instrumentality of interstate commerce or of any facility of a national securities exchange or

otherwise, knowingly, recklessly or negligently, solicited by means of a proxy statement, form of

proxy, notice of meeting or other communication, written or oral, containing statements which,

at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

118.    By engaging in the conduct alleged above, defendants Treacy and Bonica violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder.

### FOURTH CLAIM FOR RELIEF
#### (In the Alternative, Aiding and Abetting Monster's Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendant Bonica)

119.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 118 above.

120.    Monster violated Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

121.    By engaging in the conduct alleged above, defendant Bonica knowingly provided substantial assistance to Monster in its violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

122.    By engaging in the conduct alleged above, defendant Bonica aided and abetted Monster's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

## FIFTH CLAIM FOR RELIEF
### (In the Alternative, Aiding and Abetting Monster's Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder as to Defendant Bonica)

123.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 122 above.

124.    Monster violated Section 14(a) of the Exchange Act [15 U.S.C. §§ 78n(a)] and Rule 14a-9 [17 C.F.R. §§ 240.14a-9] thereunder.

125.    By engaging in the conduct alleged above, defendant Bonica knowingly provided substantial assistance to Monster in its violation of Section 14(a) of the Exchange Act [15 U.S.C. §§ 78n(a)] and Rule 14a-9 [17 C.F.R. §§ 240.14a-9] thereunder.

126.    By engaging in the conduct alleged above, defendant Bonica aided and abetted Monster's violations of Section 14(a) of the Exchange Act [15 U.S.C. §§ 78n(a)] and Rule 14a-9 [17 C.F.R. §§ 240.14a-9] thereunder.

## SIXTH CLAIM FOR RELIEF
### (Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder as to Defendants Treacy and Bonica)

127.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 126 above.

128.    Defendants Treacy and Bonica knowingly circumvented a system of internal accounting controls and/or knowingly falsified books, records or accounts.

129.    Defendants Treacy and Bonica, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

130.    By engaging in the conduct alleged above, defendants Treacy and Bonica violated

Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. §

240.13b2-1] thereunder.

## SEVENTH CLAIM FOR RELIEF
### (Violations of Exchange Act Rule 13b2-2 as to Defendant Treacy)

131.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 130 above.

132.    Defendant Treacy directly or indirectly, (i) made, or caused to be made,

materially false or misleading statements or (ii) omitted to state, or caused others to omit to state,

material facts necessary in order to make statements made, in light of the circumstances under

which they were made, not misleading, to an accountant in connection with an audit, review or

examination of financial statements or the preparation or filing of a document or report required

to be filed with the Commission.  Treacy was an officer of Monster at relevant times following

the IPO.

133.    By engaging in the conduct alleged above, defendant Treacy violated Exchange

Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## EIGHTH CLAIM FOR RELIEF
### (Aiding and Abetting Monster's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 Thereunder as to Defendants Treacy and Bonica)

134.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 133 above.

135.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1, 13a-11

and 13a-13 [17 C.F.R. §§ 240.13a-1, 240.13a-11 and 240.13a-13] thereunder, require issuers of

registered securities to file with the Commission factually accurate annual, quarterly and current

reports. Rule 12b-20 [17 C.F.R. § 240.12b-12] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made not misleading.

136.    Monster violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

137.    By engaging in the conduct alleged above, defendants Treacy and Bonica knowingly provided substantial assistance to Monster in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

138.    By engaging in the conduct alleged above, defendants Treacy and Bonica aided and abetted Monster's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

## NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Monster's
Violations of Section 13(b)(2)(A) of the Exchange Act as to Defendants Treacy and Bonica)

139.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 138 above.

140.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

28

141.    Monster violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

142.    By engaging in the conduct alleged above, defendants Treacy and Bonica knowingly provided substantial assistance to Monster in its violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

143.    By engaging in the conduct alleged above, defendants Treacy and Bonica aided and abetted Monster's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

### TENTH CLAIM FOR RELIEF
#### (Violation of Section 16(a) and Rule 16a-3 Thereunder as to Defendant Treacy)

144.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 143 above.

145.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] require officers, directors and beneficial owners of more than ten percent of any class of equity security registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file periodic reports disclosing any change of beneficial ownership of those securities.

146.    Defendant Treacy filed Forms 4 and 5 that contained false or misleading statements with regard to the options' expiration dates and exercise prices.

147.    By engaging in the conduct alleged above, defendant Treacy violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder.

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a judgment:

### I.

Permanently restraining and enjoining defendant Treacy from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Rules 10b-5, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3] thereunder, and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13 ] thereunder.

### II.

Permanently restraining and enjoining defendant Bonica from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5) and 78n(a)] and Rules 10b-5, 13b2-1 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.14a-9] thereunder, and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13 ] thereunder.

### III.

Ordering defendants Treacy and Bonica to disgorge, with prejudgment interest, all ill-gotten gains, compensation, and benefits (whether realized, unrealized or received) by virtue of the conduct alleged herein.

## IV.

Ordering defendants Treacy and Bonica to pay civil money penalties pursuant to Section 20(a) of the Securities Act [15 U.S.C. § 77t(a)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Prohibiting defendant Treacy from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Sections 21(d)(2) and (5) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VII.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated: April 30, 2008
     New York, New York

*David Stoelting*

DAVID STOELTING (DS-0565)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281-1022
Tel: 212-336-0174

Of Counsel:

     Kay L. Lackey (Not admitted in New York)
     Robert H. Murphy
     Jennifer C. Loach